Joseph ZICARELLI, Appellant

v.

Christopher DIETZ, Chairman, New Jersey Parole Board and Sally G. Carroll, Associate Member, New Jersey Parole Board.

No. 79–1722.

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1979.

Decided Sept. 9, 1980.

Certiorari Denied Jan. 12, 1981.
See 101 S.Ct. 868.

Harvey Weissbard (argued), Isles, New-man & Weissbard, West Orange, N. J., for appellant.

John J. Degnan, Atty. Gen. of New Jersey, Peter Brennan (argued), Deputy Atty. Gen., Division of Criminal Justice, App. Section, Princeton, N. J., for appellee.

Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Appellant claims that because his trial in state court took place in a county in which the crime was not committed, with a jury drawn from that county, two requirements of the Sixth Amendment were violated, the requirement that the jury must be drawn from a fair cross section of the community and the requirement that the defendant be given a trial in a district which "shall have been previously ascertained by law."[1] We believe neither claim can be sustained and affirm the judgment of the district court dismissing the petition for a writ of habeas corpus.

II.

The relevant facts were set forth in detail in this court's prior opinion on appellant's initial appeal from the district court's denial of his motion for a writ of habeas corpus. See *Zicarelli v. Gray*, 543 F.2d 466, 468–69 (3d Cir. 1976) (en banc). Briefly, seven indictments were returned against Zicarelli by a New Jersey grand jury with statewide investigative jurisdiction. The venue of the indictments had originally been laid in Hudson and in Mercer Counties, but was transferred to Burlington County in an *ex parte* proceeding by the assignment judge pursuant to a petition by the Attorney General requesting such transfer under state statutes authorizing such a procedure. N.J.S.A. 2A:73A–1, –2, –8 (1976). A hearing by the assignment judge on Zicarelli's motion to redesignate venue in Hudson County was mandated by the New Jersey Supreme Court. Following the hearing, the assignment judge denied the motion on the grounds that in Burlington County the security of the principal prosecution witness could be better maintained, an impartial jury could be impanelled that would give defendants a fair trial, a judge and a courtroom were available, and venue was not prohibited under the Sixth Amendment to the United States Constitution. Zicarelli was convicted on several counts of the last two indictments which arose out of his alleged efforts to protect from prosecution an illegal gambling operation that he controlled in Hudson County. Zicarelli's first conviction was affirmed by the New Jersey Superior Court, *State v. Zicarelli*, 122 N.J. Super. 225, 300 A.2d 154 (App.Div.), *cert. denied*, 63 N.J. 252, 306 A.2d 455, *cert. denied*, 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973) and the second conviction was initially reviewed by the Superior Court, and ultimately upheld by the New Jersey Supreme Court. *State v. Louf*, 126 N.J.Super. 321, 314 A.2d 376 (App.Div.), *aff'd in part*, 64 N.J. 172, 313 A.2d 793 (1973) (per curiam).

Zicarelli filed a petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254 alleging that his consti-

---

1. The relevant part of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law,. . . ."

tutional rights were violated when he was tried by a jury selected from residents of a county other than the one in which the alleged crimes were committed, and that he was denied the right to trial by a jury comprising a representative cross section of the locale where the crimes took place. The writ was denied by the district court. On appeal, at the oral argument before this court en banc he also claimed that the "district" from which the trial jury was chosen was not previously ascertained by law, as required by the Sixth Amendment. This court, finding that only the venue[2] claim had been presented to the state courts, reached only that aspect of Zicarelli's claim on the merits.

We assumed, without deciding, that the provision of the Sixth Amendment guaranteeing trial before a "jury of the State and district wherein the crime shall have been committed" is applicable to the states, and held that Zicarelli's federal constitutional rights were not transgressed when New Jersey tried him before a jury drawn from Burlington County on charges of criminal activity that had occurred in Hudson County. We held that "[t]he petit jury was drawn from both the state and the federal judicial district within which the crimes occurred, and the state–and–district guarantee of the Constitution promises no more." *Zicarelli v. Gray*, at 482.

We did not reach appellant's claims that placing his trial in Burlington County also violated the cross section requirement and the "previously ascertained" requirement of the Sixth Amendment because we found appellant had not exhausted his state remedies with regard to them. We are satisfied that appellant has now followed the appro-

priate procedure and has exhausted his state remedies. *See State v. Zicarelli*, 154 N.J.Super. 347, 351, 381 A.2d 398, 400 (1977), *cert. denied*, 75 N.J. 601, 384 A.2d 831 (1978). Thus, these two claims are now ripe for adjudication.

### III.

Zicarelli's argument that his trial in Burlington County violated his right to a jury drawn from a fair cross section of the community is two–pronged. He claims that his right to a jury representative of the community was violated at the outset when he was tried by jurors drawn from an area which did not include the scene of the alleged crime, and that this would constitute a violation of the Sixth Amendment even if the jury panel had perfectly reflected the narrow "community" in which the trial did take place. In essence, then, this aspect of Zicarelli's cross section claim is a geographic one. The other aspect of his claim is a demographic one, since he claims that the Hudson County population is significantly different in its demographic characteristics than the Burlington County population. He argues that since the exclusion of Hudson County jurors resulted in a panel of jurors along significantly different racial, ethnic, economic and educational lines, this constituted the exclusion of a "distinctive group" or "identifiable segment" of the community, in violation of the Sixth Amendment.

■ The cross section requirement of the Sixth Amendment, unlike the venue requirement, is not explicitly included in the language of the amendment. Nonetheless,

---

**2.** We use the term "venue" to characterize the claim previously considered by this court because that was the characterization used in our prior opinion. However, Zicarelli's argument there was that his constitutional right under the Sixth Amendment was violated when he was tried before a jury drawn from a county other than the one where the criminal activity occurred. It would appear that this is more aptly referred to as Zicarelli's "vicinage" claim, since the Sixth Amendment encompasses the vicinage requirement, specifying the geographic area from which jurors in criminal proceed-

ings must be drawn, in contrast to the venue requirement set forth in Article III, Section 2, clause 3 of the Constitution which provides that criminal trials "shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." *See* Note, *The Sixth Amendment and the Right to a Trial By a Jury of the Vicinage*, 31 Wash. & Lee L.Rev. 399, 399–400 and notes 1, 3 (1974). We will continue to adhere to our previous characterization to avoid confusion.

it is established that an essential characteristic of an impartial jury is that the jury be drawn from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 526–31, 95 S.Ct. 692, 695–98, 42 L.Ed.2d 690 (1975).[3]

The requirement of a representative jury was originally articulated as a requirement of equal protection in cases vindicating the right of a black defendant to challenge the systematic exclusion of black persons from his grand and petit juries. *See Smith v. Texas*, 311 U.S. 128, 129–30, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940). Later, the Court exercised its supervisory power over federal courts to permit any defendant to challenge the arbitrary exclusion from jury service of his or her own or any other class. *See, e. g., Glasser v. United States*, 315 U.S. 60, 83–87, 62 S.Ct. 457, 470–73, 86 L.Ed. 680 (1942); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); *Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946). The principle that a defendant's entitlement to a representative jury is an aspect of the constitutional right to jury trial protected by the Sixth Amendment first emerged in *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970). See *Peters v. Kiff*, 407 U.S. 493, 500 n.9, 92 S.Ct. 2163, 2167, 33 L.Ed.2d 83 (1972).

The nature of the jury exclusion which was the issue in these cases related to a particular sex, race or class of the population. In *Smith v. Texas, supra*, blacks were found to have been excluded from the grand jury under a jury selection scheme which permitted wide discretion in selection. In *Ballard v. United States, supra*, there was purposeful and systematic exclusion of women, whereas in *Glasser v. United States, supra*, there was alleged exclusion of certain women, those who were not members of the Illinois League of Women Voters. In *Thiel v. Southern Pacific Co., supra*, the admitted discrimination was the exclusion of those who worked for a daily wage.

The rationale given in these cases for the requirement that the jury represent a fair cross section of the community was that class distinctions and discriminations are abhorrent to the democratic ideals of trial by jury. *Thiel v. Southern Pacific Co.*, 328 U.S. at 220, 66 S.Ct. at 985. As Justice Murphy noted in *Thiel*, jury competence is an individual rather than a group or class matter. *Id.* Thus, a claim that the cross section requirement has been violated mandates essentially a demographic inquiry. *See Zicarelli v. Gray*, 543 F.2d at 474.

■ If appellant were correct that the cross section claim also comprehends a geographic component, it would, to that extent, perform the same function as the explicit venue provision of the Sixth Amendment. On his previous appeal, we considered appellant's argument that he had a constitutional right to be tried by a jury composed of residents of the county where the crime was committed, and that the exclusion of Hudson County residents from the jury venire violated the Sixth Amendment. We rejected this claim, holding that "the concept that a criminal trial must be before a jury composed of residents of the county where the crime occurred was not deemed to be of sufficient consequence to be guaranteed by the Constitution." *Id.* at 477–78. Instead it was left to Congress to determine by statute whether jurors should be summoned from the county of the crime, and Congress, which originally included such a provision in the 1789 Judiciary Act, subsequently repealed that requirement in 1862. It was implicit in our discussion that if there was any requirement in the Sixth Amendment that jurors must be drawn from the county of the crime, it must be

---

3. Congress has legislatively mandated the same requirement in the Jury Selection and Service Act of 1968, currently codified in 28 U.S.C. § 1861 (1976), which provides, in part:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

In *United States v. Zirpolo*, 450 F.2d 424 (3d Cir. 1971), we interpreted this provision to preclude partial as well as total denial of representation of women on the jury venires.

found, if anywhere, in the venue requirement. It would be anomalous were we to hold that although the explicit venue provision in the Sixth Amendment does not mandate trial by jurors of the county where the crime was committed, the implicit cross section requirement of the same Amendment does. Therefore, we reject appellant's claim that the cross section requirement was violated by the mere fact that Zicarelli was tried by a jury drawn from a panel that did not include residents of Hudson County.

We next turn to Zicarelli's claim that the demographic differences between the population of Hudson and Burlington Counties were of such quality or quantity that a jury venire excluding Hudson County residents and drawn exclusively from residents of Burlington County failed to represent a fair cross section of the community in which the crimes occurred. When Zicarelli presented his cross section claim to the New Jersey courts, he proffered the following census data derived from the 1970 U.S. Census [1970 Census of Population U.S. Dept. of Commerce Characteristics of the Population, Vol. 1, p. 32] to support his allegation:

(a) Hudson County is the smallest and, with nearly 14,000 people per square mile, the most densely populated county in the state. Burlington is the largest county in terms of square miles and, with some 274 people per square mile, one of the most sparsely populated.

(b) Burlington is one of our agricultural counties, with more acres devoted to farming than any other county. Hudson, of course, is largely industrial.

(c) 42.1% of the people in Hudson County are of foreign stock as compared with only 15.4% of the population in Burlington.

(d) In Hudson County some 46.3% of the people have a language other than English as their mother tongue; compared with slightly under 19% in Burlington County. For example, there are seven times as many Spanish speaking people in Hudson as in Burlington.

(e) In Hudson County around 36% of the people have graduated from High School compared with roughly 60% in Burlington County.

(f) In Burlington only 8.8% of the people do not even have a high school education while in Hudson the comparable figure is 23.3%.

(g) People in professional and technical work comprise about 10.3% of the population in Hudson and some 17.6% in Burlington.

(h) Factory type workers make up 20.3% of the Hudson populace and only 11.5% in Burlington.

(i) 5.2% in Burlington have incomes below the federally defined poverty level compared with 9.1% in Hudson. 17.7% in Hudson have incomes below $5,000 while the figure is only 10.7% for Burlington.

(j) The Puerto Rican population of Hudson County is over 5% while in Burlington it is less than 1%. In addition among that population those in Burlington are significantly better educated than those in Hudson.

These figures show that there is, as appellant contends, some difference in the demographic composition between Burlington and Hudson Counties. Burlington would, in ordinary parlance, be considered more rural, while Hudson would be categorized more industrial. Acknowledgment of such differences hardly foretokens that the differences are of constitutional significance.

The cross section requirement of the Sixth Amendment has been held to prohibit the systematic exclusion of distinctive groups in the community. *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701. In discussing this requirement, the Court has rejected the argument that every distinct voice in the community has a right to be represented on every jury. "All that the Constitution forbids . . . is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels." *Apodaca v. Oregon*, 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972) (plurality opinion).

In an effort to come within this precedent, Zicarelli claims that an identifiable group has indeed been intentionally excluded, and identifies that group as a geographic one, all those from Hudson County. The language in *Thiel v. Southern Pacific Co.* stringing together "all of the economic, social, religious, racial, political and geographical groups of the community" who cannot be systematically and intentionally excluded, 328 U.S. at 220, 66 S.Ct. at 985, is cited to support the claim that geographic groups within the community have the same characteristics of group identification as do groups differentiated by race, sex and class. Nothing in the *Thiel* case itself supports that argument, since the facts of that case involved exclusion of laborers who worked for a daily wage. There is a manifestly higher cohesion of interest among day laborers, who may be considered to represent an economic class, than among those brought together by the mere coincidence of the geographic unit where they live.

Zicarelli relies primarily on two cases decided by state supreme courts for his claim that exclusion of a group based upon geography is constitutionally invalid. In *Alvarado v. State*, 486 P.2d 891 (Alaska 1971), defendant, a partial Aleut Indian who was found to be closely allied to the lifestyle of Alaska Native culture, was indicted for rape committed in his home community, Chignik, a remote rural area 450 miles from Anchorage with a total population of 100, 95 of whom were Indians. The area was culturally isolated, without television, running water, roads or cars. The principal contact with the outside community was a weekly airplane flight. Alvarado's trial took place in Anchorage, where all prospective jurors were chosen from an area within a radius of 15 miles of Anchorage. Of particular significance was the fact that this 15 mile line precluded residents of virtually all Native villages from representation on the jury panel. The Court found that because of the profound cultural differences between the Native villages and the urban areas of Alaska, Alvarado's trial before a jury drawn from a panel which excluded virtually all residents of such Native villages could not be considered impartial because the jury could not have adequately represented a fair cross section of the community in which the crime occurred. The inapplicability of the holding to other geographic areas was stressed several times by the court. It stated, "Because of the vast expanses of land which lie within the borders of our state, because of the variety of the cultural heritage of our citizens and because of the relative sparseness of our population, the problem of selecting juries in Alaska is unique." *Id.* at 905.

The other case relied on by Zicarelli is *People v. Jones*, 9 Cal.3d 546, 510 P.2d 705, 108 Cal.Rptr. 345 (1973), in which a closely divided California Supreme Court held that a defendant had a constitutional right to be tried by a jury which included the precinct in which the crime was allegedly committed. The majority intermingled in its rationale the explicit "State and district" provision of the Sixth Amendment, which it interpreted to apply also to the county of the crime, and the implicit cross section requirement of that Amendment. The California court's interpretation of the "State and district" provision is contrary to that of this court in *Zicarelli v. Gray, supra,* to which, of course, we adhere. Its holding that the representative cross section requirement encompasses the right to be tried by a jury selected from residents of the area where the crime was committed is contrary to other precedent, which we find more persuasive.

■ We begin with the well–established principle that a defendant does not have a right under the Sixth Amendment to have jurors drawn from the entire district. *Lewis v. United States*, 279 U.S. 63, 72, 49 S.Ct. 257, 259, 73 L.Ed. 615 (1929); *Ruthenberg v. United States*, 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918); *United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972). As noted by Judge Learned Hand in *United States v. Gottfried*, 165 F.2d 360 (2d Cir.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948), the district and circuit courts had the power since enactment of the Judiciary Act of 1789:

to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity. Furthermore, it would be impossible in practice to administer it, if it were a condition that the divisions made must be so homogeneous that they showed an equal percentage of all possible groups.

*Id.* at 364 (footnotes omitted). In *Gottfried*, the court rejected a challenge to the jury selection procedures in the Southern District of New York whereby all jurors were chosen from three out of the eleven counties in the district. Appellants had argued that this procedure resulted in an imbalance between urban and rural jurors, because the counties from which jurors were chosen were by far the most heavily populated areas in the district. The court noted that there were rural areas in the counties from which the jurors were drawn and that inclusion of the other counties would only slightly increase the probability of the presence of rural jurors on a particular jury. *Id. See also State v. Kappos*, 189 N.W.2d 563, 564 (Iowa 1971), *cert. denied*, 405 U.S. 982, 92 S.Ct. 1246, 31 L.Ed.2d 449 (1972).

■ Furthermore, it has also been held that there is no constitutional right to a jury chosen from the division where the offense was committed or from the entire district which includes that division. In *United States v. Florence*, 456 F.2d at 48–49, the Fourth Circuit rejected the claim that the Sixth Amendment precluded appellant's trial in a division other than that where the offense had occurred and where appellant had been a lifelong resident. Although the court in *Florence* did not discuss the constitutional cross section requirement, the First Circuit in *United States v. Cates*, 485 F.2d 26, 29 (1st Cir. 1974), held that the statutory cross section requirement did not require that a grand jury be chosen from any particular division within a district. In *People v. Taylor*, 39 N.Y.2d 649, 350 N.E.2d 600, 385 N.Y.S.2d 270 (1976), the New York

Court of Appeals rejected a federal constitutional challenge to statutory procedures which resulted in defendant's being tried by a jury drawn entirely from New York County for a crime committed in Kings County. The court concluded that in the absence of a showing of some significant disparity, *e. g.* in the racial, ethnic or sexual composition of geographic groups, such geographic groups were not distinctive or cognizable groups for the purposes of analysis under the cross section requirement. *Id.* at 655, 350 N.E.2d at 603–04, 385 N.Y.S.2d at 273.

A claim analogous to Zicarelli's, that residents of a county should be considered a distinct group for cross section analysis, was rejected by the First Circuit. The court accepted young adults, sex, and educational attainment as legally cognizable groups for purposes of the cross section claim. *United States v. Butera*, 420 F.2d 564 (1st Cir. 1970); but see *United States v. Test*, 550 F.2d 577, 590–93 (10th Cir. 1976). It rejected defendant's claim that county residence could be considered such a legally cognizable group. It gave the following reason for the distinction:

More importantly, however, we are not aware that residents of counties can be said to hold views and attitudes which are in any way "distinct" from those of their neighbors in nearby counties, nor has defendant given us any evidence of such distinctness. While common experience tells us that people's attitudes differ to some degree along lines of age, sex and extent of education, we are not aware that they differ along county lines. We have been willing above to give a broad meaning to the requisite "distinctness" of classes but in each instance we could point to some indication that the groups isolated by defendant–at least in a general sense–possessed the essential element of distinctness. That term would have no meaning at all were we to say–in the absence of any supporting evidence–that residents of some counties have views and attitudes genuinely distinct from those of nearby counties.

*United States v. Butera*, 420 F.2d at 572 (footnotes omitted). This is consistent with the approach taken by the Supreme Court in considering why a distinct group cannot be excluded from the jury array. The Court has stated that it has been because members of such identifiable groups, such as women "bring to juries their own perspectives and values that influence both jury deliberation and result." *Taylor v. Louisiana*, 419 U.S. at 532 n.12, 95 S.Ct. at 699.

Zicarelli does not contend that the selection of jurors from Burlington County resulted in the exclusion of any identifiable segment of the community from the jury panel. Although the data he produced shows that there may be more of one identifiable segment of the community in one county than in the other, it fails to show that any identifiable group is unrepresented in Burlington County or that there is such a gross disproportionate representation of any identifiable group that it is tantamount to an exclusion which might fairly be reflected in the jury's "perspective and values."

In the absence of any showing of such exclusion, Zicarelli's argument is reduced to one claiming that the jury panel must fairly mirror the community in which the crime was allegedly committed. That contention has been rejected both in the context of the petit jurors actually chosen and the jury venire. The Supreme Court has said, "It should also be emphasized that in holding that petit jurys must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 702. In *Fay v. New York*, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947), the Court considered whether the lack of proportional representation of various groups on New York's special or "blue ribbon" jury panel violated the Constitution. The Court noted that since we have never required proportional representation along racial lines, it would be much more imprudent to require proportional representation of economic classes. After commenting about the difficulty in classifying the occupations which were said to comprise the economic class allegedly excluded from the special panel in that case, laborers, craftsmen and service employees, the Court stated:

> No significant difference in viewpoint between those allegedly excluded and those permitted to serve has been proved and nothing in our experience permits us to assume it. It would require large assumptions to say that one's present economic status, in a society as fluid as ours, determines his outlook in the trial of cases in general or of this one in particular. There is of course legitimate conflict of interest among economic groups, but they are so many and so overlie each other that not all can be significant. There is entrepreneur and wage–earner, consumer and producer, taxpayer and civil servant, foreman and laborer, white–collar worker and manual laborer. But we are not ready to assume that these differences of function degenerate into a hostility such that one cannot expect justice at the hands of occupations and groups other than his own. Were this true, an extremely rich man could rarely have a fair trial, for his class is not often found sitting on juries.

*Id.* at 291–92, 67 S.Ct. at 1629–30 (footnotes omitted).[4]

It is important in making a cross section inquiry to keep in mind the paramount purpose of the requirement that a jury represent a fair cross section of the community. In *Taylor v. Louisiana*, 419 U.S. at 526, 95 S.Ct. at 696, the Court held that "the

---

4. Although portions of the discussion in *Fay v. New York* have since been overruled, such as that concerning the application of the Sixth Amendment to the states, 332 U.S. at 288, 67 S.Ct. at 1627, *see Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the majority's discussion of lack of proportional representation has not been disapproved or undermined. It was cited for that proposition in *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701.

presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an *impartial jury trial in criminal prosecutions*" (emphasis added). In *Thiel v. Southern Pacific Co.*, it was stated that "the broad representative character of the jury should be maintained, partly as *assurance of a diffused impartiality* and partly because sharing in the administration of justice is a phase of civil responsibility." 328 U.S. at 227, 66 S.Ct. at 989 (Frankfurter, J., dissenting) (emphasis added).

We conclude that the demographic differences shown by Zicarelli between Burlington and Hudson counties are not sufficiently substantial in terms of the characteristics which foster group identification to reflect adversely on the ability of the Burlington County jury panel to perform its jury function with impartiality, either in actuality or in appearance.

Although we do not decide whether the cross section claim would preclude exclusion of a geographic group when the group is profoundly culturally distinct, as it was in *Alvarado v. State*, 482 P.2d 891 (Alaska, 1971), we hold that the record in this case does not show that the exclusion of Hudson County residents from the jury venire resulted in the exclusion of any significant element or discernible class of the community. Therefore, we reject Zicarelli's claim that his trial violated the cross section requirement of the Sixth Amendment.

### IV.

Zicarelli's second contention before us is that his trial in Burlington County violated the clause of the Sixth Amendment which requires that the "district [from which the jury must be chosen] shall have been previously ascertained by law . . .." We

must first determine whether this clause, which has received scant attention in the last two centuries, is applicable to the states, an inquiry which requires, in the first instance, our analysis of its meaning.

Justice Black's view that the Bill of Rights was completely incorporated into the Fourteenth Amendment's due process clause, and hence fully applicable to the states, see *Adamson v. California*, 332 U.S. 46, 71–72, 89, 67 S.Ct. 1672, 1686, 1695, 91 L.Ed. 1903 (1947) (dissenting opinion), has never been adopted by the Court. Instead, many of the rights guaranteed by the first eight Amendments have been "selectively" absorbed into the Fourteenth.[5] *See* L. Tribe, American Constitutional Law 567–68 (1978). The determination whether a right covered by the Fifth and Sixth Amendments with respect to federal criminal proceedings is also protected against state action by the Fourteenth Amendment has been said to depend on whether the right is among those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," *Powell v. Alabama*, 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932); whether it is "basic in our system of jurisprudence," *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948); and whether it is "a fundamental right, essential to a fair trial," *Gideon v. Wainwright*, 372 U.S. 335, 343–44, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964); *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965).

The right to jury trial in the Sixth Amendment was incorporated within the concept of due process and hence applicable to the states in serious criminal cases because a jury was deemed to give the defendant "an inestimable safeguard against the corrupt or overzealous prosecutor and

---

**5.** Notwithstanding Justice Harlan's persistent objection to the premise that the Fourteenth Amendment incorporates or absorbs as such some of the specific provisions of the Bill of Rights, *see, e. g., Klopfer v. North Carolina*, 386 U.S. 213, 226, 87 S.Ct. 988, 995, 18 L.Ed.2d 1 (1967) (concurring opinion), the Court has continued to analyze the issue in terms of whether rights specified in the first eight amendments are also protected against state action by the Fourteenth Amendment. *See, e. g., Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968).

against the compliant, biased, or eccentric judge." *Duncan v. Louisiana*, 391 U.S. at 156, 88 S.Ct. at 1451. However, this does not mean that every feature of a jury trial as it existed at common law is necessarily applicable to the states. Unanimous jury decisions, constitutionally required in federal prosecutions, are not required in state trials. *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (plurality opinion). Also, because the common law jury's composition of precisely twelve persons is considered an historical accident, it was held to be unnecessary to effect the purposes of the jury system and hence subject to change by the states. *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

■ The provisions of the Sixth Amendment, which, in addition to trial by jury, have been made specifically applicable to the states are the right to a public trial, *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); to confrontation, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); to a fair and speedy trial, *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); and to compulsory process in obtaining witnesses, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

■ We might rely solely on the patent inapplicability to the states of the language of the "previously ascertained by law" clause applying as it does only to a "district," a point to which we will return. However, the courts in their analysis of the application to the states of particular Sixth Amendment provisions have generally inquired into the historical antecedent of the provision and considered its possible application in light of reason and reflection.

The difficulty of ascertaining the constitutional scope of various jury trial attributes in light of the sparse historical evidence has been commented upon on several occasions by the Supreme Court. See *Williams v. Florida*, 399 U.S. at 93, 90 S.Ct. at 1902, *Apodaca v. Oregon*, 406 U.S. at 409, 92 S.Ct. at 1632. No aspect of the jury trial seems to us to be more shrouded in obscurity than the "previously ascertained by law" clause. The issues of vicinage and unanimity were at least the subject of discussion contemporaneous to the drafting of the Bill of Rights and the Judiciary Act of 1789 which could be considered in recent decisions raising those issues. In contrast, diligent research into the leading sources of Sixth Amendment analysis [6] has disclosed no discussion or reference to the "previously ascertained" clause. Our frustration is shared by assiduous researchers into the history and scope of the Amendment.[7]

The substance of current knowledge regarding this part of the Sixth Amendment was discussed in *Williams v. Florida, supra*, and in our prior opinion in this case. We know that one of the Articles of Amend-

---

6. F. Heller, The Sixth Amendment (1969 ed.); M. Farrand, The Records of the Federal Convention (1911); 1 Annals of Cong. (Gales & Seaton ed. 1834); Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue*, 43 Mich.L.Rev. 59 (1944); Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv.L.Rev. 49 (1923); Frankfurter and Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury*, 39 Harv.L.Rev. 917 (1926). Also consulted were Elliot, Debates on the Adoption of the Federal Constitution (1901); A. Hamilton, The Federalist (1873); 1 W. Holdsworth, A History of English Law 298–350 (1922); 4 W. Blackstone, Commentaries on the Laws of England 350–51 (Cooley ed. 1899); F. Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws (1909).

7. Heller wrote that: "Any attempt to trace the exact development of the finished product, to ascribe with definitive certainty the authorship of specific words, or to place the responsibility for its ultimate form and arrangement, continues to the present to be frustrated and hampered by the complete lack of information on the proceedings in the Senate." F. Heller, *supra* note 6, at 33.

Frankfurter and Corcoran also stated: "We must largely guess whether considerations of substance or style, deep meaning or minor factors of drafsmanship, determined the form of words which finally appeared in Article III and the Sixth Amendment and governed their relation to each other." Frankfurter and Corcoran, *supra* note 6, at 968–9.

ment adopted by the House of Representatives on August 24, 1789 and sent to the Senate provided that "The trials of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, the right of challenge, and other accustomed requisites. . . ."[8] This provision was unacceptable to the Senate, and was deleted when the proposed Amendments were sent back for concurrence of the House on September 10, 1789. The House refused to agree and a Conference Committee of the two chambers was appointed. Its deliberations are not known, but it emerged with the language which was to become the Sixth Amendment insuring "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."

We do not know at whose suggestion or insistence the "previously ascertained by law" clause was inserted, whether it was in any way a substitute for the language "and other accustomed requisites" (of a trial by jury) in the House proposal authored by Madison, or what it was intended to accomplish. It is of interest that there was no such clause in the jury trial provisions of Virginia, Pennsylvania or Maryland, which are considered to have been the models used by Madison when he drafted the proposed amendment.[9] The controversy which swirled around the jury trial amendment focused primarily on the vicinage requirement, the camps dividing into those who believed the Constitution should insure that the accused was entitled to be tried by a jury of the county, while others preferred the much more vague "vicinage" language.

Madison, whose writings are the primary source of our information on the views of the conferees, wrote in a September 23, 1789, letter that:

> [The Senate] are . . . inflexible in opposing a definition of the locality of Juries. The vicinage they contend is *either too vague* or too strict a term; *too vague if depending on limits to be fixed by the pleasure of the law*, too strict if limited to the county.[10] It was proposed to insert after the word Juries, "with the accustomed requisites," leaving the definition to be construed according to the judgment of professional men. Even this could not be obtained . . . The Senate suppose, also, that the provision for vicinage in the Judiciary bill will sufficiently quiet the fears which called for an amendment on this point[11] (emphasis added).

The ensuing compromise required merely that the trial be of a jury of the state and judicial district, which district was to be established by Congress.

The other relevant historical factor which must be taken into account was the obvious concern of the framers of the Constitution over the threat of the King, in the last days of the colonial experience, to transport colonists accused of treason to trial in England. This would have revived the statute of 35

---

**8.** 1 Annals of Cong. 760 (Gales & Seaton ed. 1834).

**9.** See Frankfurter and Corcoran, *supra* note 6, at 964, 974 and notes 259–61.

**10.** Warren inexplicably uses the word "country" instead of "county" at this point of Madison's letter, Warren, *supra* note 6 at 129, and Warren's language is repeated in our prior opinion, 543 F.2d at 476. The Supreme Court, in its quotation of the Madison letter, uses "county." *Williams v. Florida*, 399 U.S. at 95, 90 S.Ct. at 1903. Viewed in the context of the debate at that time, "county" would appear to be the historically consistent word, since Madison's letter a week earlier referred to the practice in some states of picking juries from the state at large contrasted to the practice in other states of picking juries from the county alone. Letter from James Madison to Edmund Pendleton, Sept. 14, 1789, in 1 Letters and Other Writings of James Madison 491 (Lippincott ed. 1865). In any event, the quotation above is the form in which the letter appears in the two compilations of the Writings of James Madison, see note 11 *infra*. However, we note that the Bill of Rights of the Pennsylvania 1776 Constitution provided for the right to "an impartial jury of the *country*" (emphasis added).

**11.** 1 Letters and Other Writings of James Madison 493 (Lippincott ed. 1865); 5 The Writings of James Madison 424 n.1 (G. Hunt ed. 1904).

Henry VII (1543) providing that treason should be tried by commissioners "as shall be assigned by the King." The Virginia Resolves, issued May 16, 1769, were a vigorous protest to this practice. One of the "resolves" asserted that a person accused of any felony or crime committed within the Colony and Dominion (Virginia) had a right to be tried before the King's courts, "within the said Colony, according to the fixed and known Course of Proceeding," and that sending the accused to be tried to "Places beyond the Sea . . . is highly derogatory of the Rights of *British* subjects; as thereby the inestimable Privilege of being tried by a Jury from the Vicinage, as well as the Liberty of summoning and producing Witnesses on such Trial, will be taken away from the Party accused." [12] The Virginia Resolves were promptly approved by the assemblies of the other American Colonies.[13] The English Parliamentary minority recognized that such arbitrary treatment as being dragged from one's native land, to exchange "Imprisonment in his own Country for Fetters Amongst Strangers" might well lead to war,[14] as indeed it did. One of the King's "injuries and usurpations" cited in the Declaration of Independence was "For transporting us beyond Seas to be tried for pretended offenses."

From the meager evidence before us, we must speculate about the meaning of the "previously ascertained by law" clause of the Sixth Amendment as it applies to federal cases, before we can reach the issue of whether it applies to state cases. It would appear, and we acknowledge again the uncertain road upon which we tread, that before the compromise vicinage provision emerged in 1789 from the joint Committee providing only that criminal trials must be held within the state and district where the offense was committed, reluctant conferees needed some assurance that the districts would not be readjusted arbitrarily to meet the circumstances of a particular case. If the vicinage provision had been restricted to juries drawn from the county of the offense, as some desired, the states, which fix the boundaries of their own county lines, would have had the power to determine the geographic areas from which federal juries must be drawn.[15] However, with the vicinage provision limited to districts, which only Congress had the power to fix, the conferees may have believed additional protection was needed to prevent Congress from arrogating to itself the very power which the King had adopted and which was the subject of the protest of the Virginia Resolves. Thus, the "previously ascertained by law" clause was designed as a check on Congress, which, although free to alter and revise the size of judicial districts to meet the needs and circumstances of changing times, cannot constitute or reconstitute a district to affect a criminal case after commission of the alleged offense.

This is consistent with the purpose of the Sixth Amendment summarized by the first Justice Harlan in *Schick v. United States,* 195 U.S. 65, 78, 24 S.Ct. 826, 831, 49 L.Ed. 99 (1904) (dissenting opinion), as follows:

> Those who opposed the acceptance of the Constitution said, among other things, that the words of that instrument, strictly construed, (Art. 3, § 2) admitted of a secret trial, or of one that might be indefinitely postponed to suit the purposes of

---

12. Quoted in Blume, *supra* note 6, at 64.

13. *Id.* at 65.

14. See *Id.*

15. The Pennsylvania Supreme Court, in interpreting its own Constitution, has pointed out the distinction between the "vicinage", a vague designation, and "county" which is a "definitely designated territory." *Commonwealth v. Collins,* 268 Pa. 295, 300, 110 A. 738, 739 (1920). It also noted the state's power to revise county boundary lines unless prescribed

> by a constitutional provision: "By the common law all offenses were inquired into and tried in the county where they were committed, and the visne or neighborhood from which a sheriff was required to return a panel of jurors was interpreted as meaning county. 4 Blackstone, 350. But Parliament could have changed or made exceptions to this common-law rule, and the Legislatures of the different states can do likewise, in the absence of constitutional limitations upon them." *Id.*

the Government, or *of one taking place in a state or district other than that in which the crime was committed.* The framers of the Constitution disclaimed any such evil purposes; but in order to meet the objections of its opponents, and to remove all possible ground of uneasiness on the subject, the Sixth Amendment was adopted, in which the essential features of the trial required by Section 2 of Article 3 are set forth (emphasis added).

Such judicial interpretation of the "previously ascertained by law" clause as exists has been made in the context of the effect of this clause on trials following establishment of a new district or readjustment of the boundaries of a previously established district. Originally, whenever Congress created a new district in a state or transferred certain counties from one district or division to another district or division, it made special provision for the continuance of the jurisdiction of offenses committed prior thereto. See *Mizell v. Beard*, 25 F.2d 324, 325 (N.D.Okl.1928). In 1911, Congress enacted such a provision into general law, Act of March 3, 1911, c. 231, § 59, 36 Stat. 1103, currently in 18 U.S.C. § 3240 (1976), providing that whenever any new district or division is established, or any county or territory is transferred from one district or division to another district or division, prosecutions for offenses committed within such district, division, county, or territory prior to such transfer, shall be commenced and proceeded with the same as if such new district or division had not been created, or such county or territory had not been transferred, unless the court, upon the application of the defendant, shall order the case to be removed to the new district or division for trial.

This provision was construed in *Lewis v. United States*, 279 U.S. 63, 49 S.Ct. 257, 73 L.Ed. 615 (1929), where the petitioners challenged their indictment and trial as violating the "previously ascertained by law" clause of the Sixth Amendment. Petitioners were convicted for crimes committed in 1923 in Tulsa County. Tulsa County was part of the Eastern District of Oklahoma until 1925, when it, along with nine other Oklahoma counties, was transferred to the newly established Northern District of Oklahoma. Before petitioners' indictment and trial in the Eastern District of Oklahoma, the court removed from the jury box from which the grand and petit jurors were drawn the names of all persons from the ten counties that had been transferred to the Northern District. Although the jury box thus contained no jurors from Tulsa County, the Supreme Court concluded that petitioners were both indicted and tried in the court for the Eastern District sitting as the court for the entire original district, including the counties that had been transferred to the Northern District after the offenses were committed. "And, as this district had been ascertained by § 101 of the Judicial Code before the offenses had been committed, there was no violation of the provision of the Sixth Amendment granting an accused person the right to a trial by a 'jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.'" *Id.* at 71–72, 49 S.Ct. at 259–60.[16]

On the other hand, when an offense was not committed within a state but in territory assigned to a district for judicial purposes, the "previously ascertained" provision was held to be inapplicable and Congress could, pursuant to Article III, Section 2, clause 3, fix another district for trial of such offenses after they were committed. *Cook v. United States*, 138 U.S. 157, 181–82,

**16.** A decision that the constitutional provision was applicable only to pending criminal actions and not to those where the offense was committed before the rearrangement of districts, *Quinlan v. United States*, 22 F.2d 95 (5th Cir. 1927), *cert. denied*, 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (1928), has since been repudiated by the court which rendered it. *Hayes v. Unit-*

*ed States*, 407 F.2d 189 (5th Cir.), *cert. denied*, 395 U.S. 972, 89 S.Ct. 2133, 23 L.Ed.2d 777 (1969). *See also Mizell v. Beard*, 25 F.2d 324 (N.D.Okl.1928); *United States v. Hackett*, 29 F. 848, 849 (C.C.N.D.Cal.1887); *United States v. Maxon*, 26 Fed.Cas. 1220, No. 15748 (C.C.E.D. N.Y.1866).

11 S.Ct. 268, 274–75, 34 L.Ed. 906 (1891); *United States v. Dawson*, 56 U.S. 467, 15 How. 467, 14 L.Ed. 755 (1853 Term).

From the sketchy history and the available precedent, it can be fairly inferred that the "previously ascertained by law" clause was tied to the English practice of removing prisoners for trial to England or elsewhere. As argued by appellant's counsel to the Supreme Court in *United States v. Dawson*, "it would be intolerable if a power existed by which, if a man committed an offence in Oregon or Florida, Congress might, in order to strike him down with perfect certainty, attach the particular place where he committed the offence to the District of Maine, so as to carry him to Portland for trial; retaining, of course, the power to sever again from the district the country so attached, so soon as the political or other offender should be immolated, and the ends of public or party vengeance attained." *Id.*, 56 U.S. at 472–73, 15 How. 473–74.

Viewed in this light, there would be no reason to apply such a clause to the states, who have no role in establishing or redistricting of federal judicial districts. Although the geographic distances within some states may be large, they are not comparable to the stretch from the colonies to England, nor the potential distance from one judicial district to a noncontiguous one in the United States. Furthermore, the language of the clause is strictly applicable only to "districts," and we have previously held that "districts" referred to in the Sixth Amendment were the federal judicial districts established elsewhere in the Judiciary Act. 543 F.2d at 477 n.59.

Finally, if we use the same analytic process used by the Supreme Court when determining whether a right is an essential and fundamental right for the kind of fair trial which is this country's constitutional goal, *Pointer v. Texas*, 380 U.S. at 405, 85 S.Ct. at 1068, we discern substantial differences between the right to have one's jury drawn from a previously ascertained geographic area and the rights which have been held applicable to state trials. For example, using the factors referred to in *Klopfer v. North Carolina*, 386 U.S. at 223, we note that the right to a jury from a place "previously ascertained by law" was not referred to in the Magna Carta.[17] It is not a right which has been considered of such importance that it has been widely adopted by all of the states. Of the fifty states, only three have any provision in their constitutions comparable to this Sixth Amendment clause.[18] Of the original states, none provided for previously ascertained districts or counties in their constitutions when providing for the constitutional right to jury trial.[19] It is therefore difficult to classify this right as among those which are "of the very essence of a scheme of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

Thus, we conclude that the provision of the Sixth Amendment providing for the right to have a jury from a district "previously ascertained by law" applies only to federal criminal trials, and not to state

---

**17.** The closest parallel in the Magna Carta was Clause 17. "The Common pleas shall not follow our court but shall be held in some certain place." Even if this could be translated into a requirement of previous ascertainment, it was inapplicable to criminal cases since the Court of Common Pleas had jurisdiction confined to civil matters. 1 Holdsworth, *supra* note 6, at 195–203.

**18.** *See,* Hawaii Const. Art. I, § 14; Minn.Const. Art. I, § 6; Wis.Const. Art. I, § 7.

**19.** See, F. Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws (1909) [hereinafter cited as Thorpe]. The original constitutional provisions can be found as follows: Conn.Const. of 1818, Art. I,

§ 9 in 1 Thorpe 538; Del.Const. of 1792, Art. I, § 4 in 1 Thorpe 569; Ga.Const. of 1777, Art. XXXIX in 2 Thorpe 783; Md.Const. of 1776, Declaration of Rights, Art. XVIII in 3 Thorpe 1688; Mass.Const. of 1780, Part the First, Art. 13 in 3 Thorpe 1891; N.H.Const. of 1784, Art. I, § 17 in 4 Thorpe 2455–56; N.J.Const. of 1776, Art. XXII in 5 Thorpe 2598; N.Y.Const. of 1777, Art. XLI in 5 Thorpe 2637; N.C.Const. of 1776, Declaration of Rights, § 9 in 5 Thorpe 2787; Pa.Const. of 1776, Declaration of Rights, § 9 in 5 Thorpe 3083; R.I.Const. of 1842, Art. I, § 10 in 5 Thorpe 3223; S.C.Const. of 1778, Art. XLI in 6 Thorpe 3257; Va.Const. of 1776, Declaration of Rights, § 8 in 7 Thorpe 3813.

criminal trials. Our holding, of course, would not leave criminal defendants totally without recourse were their state trials conducted under procedures which violate fundamental principles of liberty and justice. Removal of a defendant from his or her home county where the offense was committed, without good reason, to be tried before a jury drawn from a far distance from home, without having prior notice of the place of trial for the offense previously ascertained by law might constitute such an arbitrary act that it violates due process as protected by the Fourteenth Amendment. This was not the ground on which Zicarelli based his claim. While we share our dissenting colleague's concern with a procedure which appears to permit assignment of the place of trial at the unfettered discretion of the prosecuting authority or assignment judge, we see nothing in the history or the language of the "previously ascertained by law" clause of the Sixth Amendment to compel or justify extending its scope beyond the federal judicial district to which it is explicitly tied. We hold that the "previously ascertained by law" clause of the Sixth Amendment is not applicable to the states, and therefore does not provide the standard by which to gauge the constitutionality of New Jersey's action in transferring Zicarelli's trial to Burlington County to be tried before a jury of that county.

For the foregoing reasons, we will affirm the judgment of the district court denying the requested writ of habeas corpus.

GIBBONS, Circuit Judge, dissenting:

When this long drawn out case was before the court en banc it was my view that Mr. Zicarelli's fair cross section claim had already been presented to and properly rejected by the New Jersey Courts. 543 F.2d 466, 489 (3d Cir. 1976). That claim is before us again, in a posture essentially no different, except for age, than when we considered it four years ago. Essentially for the reasons set forth in Part III of Judge Sloviter's opinion, I adhere to my previous view on the cross section claim. There is no

geographic component in the fair cross section requirement. The state venue requirement incorporated in Article III, section 2, clause 3 of the Constitution is not applicable to the states, even by analogy, since unlike the federal government, states are limited in the exercise of their judicial power to a single geographic area. The fair cross section requirement is related to the exclusion of classes, and for purposes of class exclusion geography will usually be irrelevant. That is not always the case. It is conceivable that residential patterns may be such that manipulation of the vicinage will result in exclusion of classes. *See, e. g., Alvarado v. State*, 486 P.2d 891 (Sup.Ct. Alaska 1971). *Cf. People v. Jones*, 9 Cal.3d 546, 108 Cal. Rptr. 345, 510 P.2d 705 (1973). But in this case the record does not support the inference that moving the vicinage from Hudson County to Burlington County had either the purpose or the effect of excluding from the jury panel from which the trial jury was selected any group or class which has been recognized by federal law for purposes of the fair cross section rule. The demographic differences which have been shown are, as Judge Sloviter points out, insubstantial.

Mr. Zicarelli's claim that there has been a violation of the Sixth Amendment requirement that trial be in a district "previously ascertained by law" was also presented to us in the prior appeal, but was not considered because it had not been presented to the New Jersey Courts. It has now been considered by those courts and rejected. The majority also rejects it. I dissent from that rejection.

No purpose would be served by a repetition of the scant historical materials bearing upon the adoption of the "previously ascertained by law" requirement. Judge Sloviter has made reference to all of which I am aware. But I part company from the majority in the use to which that material has been put.

One of the grievances which the colonies adopted against King George was the practice of transporting colonials beyond the

seas for trial.[1] When those colonies became states, any purported authority of a superior sovereign to remove persons from within their geographic limits came to an end. In the Articles of Confederation the now independent states carefully preserved to themselves their monopoly on sanctioning individuals within their own geographic limits. *See* Art. II, IX, Articles of Confederation. This treaty model of a federal union proved unworkable, and the 1787 Constitution restored some features of the empire system which the Articles of Confederation had supplanted. The chief added feature was the partial surrender in Article III to a super sovereignty of the monopoly on sanctioning which the colonies had wrested from the empire. But in making that surrender the people of the states incorporated in Article III several limitations upon the sanctioning power of the new federal government. Some of those limitations, such as the definition of treason in Art. III, section 3, were carried forward from ancient British statutes which had by then come to be regarded as a part of the British Constitution, The same may be said for the guarantee in Article III, section 2, clause 3, of jury trial in criminal cases. The additional guarantee that "such Trial shall be held in the State where the said Crimes shall have been committed" was, I believe, a reflection of the old grievance against the empire, that the superior sovereignty could and did transport colonials out of their home colonies for trial abroad. The new federal government was prohibited from doing so. I do not believe the clause has anything to do with the composition of the jury, except to the extent that placing the trial in the geographic area of a state determined that composition.

When the 1787 Constitution was sent to the people of the states for ratification it was not at all clear that there would be lower federal courts of original jurisdiction. Had the first Congress opted for the exercise of the judicial power of the United States solely by means of appeal, the place of trial provision in Article III, section 2, clause 3 would have been a redundancy. But when it became clear that Congress would need federal courts of original jurisdiction, if for no other reason than to enforce the revenue laws, new problems arose. Article III, section 1 gave Congress power to ordain and establish inferior courts, and presumably to define their geographic jurisdiction. In exercising that power Congress obviously could not violate the prohibition in Article III, section 2, clause 3 against removing a defendant for trial from the geographic area of the state in which the crime occurred. If there were to be multi-state districts, for example, the trial still would have to take place in the state where the crime occurred. But Congress could and did create more than one district within the territory of a single state.[2] That allocation posed three issues. One was the jury vicinage issue, which Judge Sloviter discusses in Part IV of the majority opinion. The second was the geographic issue of transporting defendants to distant districts, which was a refinement of the problem addressed in Article III, section 2, clause 3. The third, which the majority has chosen to disregard, was the problem of Congress manipulating the boundaries of districts after the events constituting the alleged offense had already transpired.

I agree with the majority that such historical evidence as we have been able to find supports the conclusion that the Sixth Amendment, as finally adopted, did not incorporate a geographic vicinage requirement. The amendment went no further than to refine the geographic rule already found in Article III, section 2, clause 3 by prohibiting the federal government from transporting a defendant for trial outside a district within a state if there was more than one such district. The majority reads the place of trial provision in the Sixth Amendment in the same manner. But the

---

1. *See* Declaration of Independence, in H.S. Commager, ed. Documents of American History 101 (1940).

2. The first judiciary act established two districts each in Massachusetts and Virginia. Act of Sept. 24, 1789 § 2, 1 Stat. 73.

majority discussion proceeds on what I believe to be an erroneous assumption that the place of trial provisions in the Sixth Amendment and in Article III are addressed only to jury selection.[3] Much more was involved in the colonial grievance against transport for trial, including ability to raise bail among friends, availability of witnesses, access to counsel, and proximity of friends and relatives. Even the very psychological pressure of incarceration while awaiting trial at a place far from home tended to operate in favor of the power of the sovereign against the individual, and to tilt the balance against an outcome favorable to a defendant. These concerns, probably more than concerns of jury vicinage, produced the initial Article III geographic limitation and the refined limitation in the Sixth Amendment.

The "previously ascertained by law" clause in the Sixth Amendment, however, introduces an entirely new subject matter. Article III, section 2, clause 3 by itself would prevent removal for trial across state lines. The language in the Sixth Amendment "State and district wherein the crime shall have been committed," standing alone, makes a temporal reference. The state and district is a geographic area existing when the offense is committed. The additional language "which district shall have been previously ascertained by law" must, I think, have an additional, non–geographic, anti–manipulative purpose.[4]

One manipulative purpose against which the Sixth Amendment guards might be an attempt by the federal government, after events allegedly criminal had taken place, to erect a new district within a former state and district, and to appoint a judge believed to be more sympathetic to the current administration's viewpoint. Another might be the exclusion of rural in favor of urban jurors, who might be thought to have different political outlooks. The early history of the Article III courts suggests that such purposes were thought by many to be within the realm of possibility at least. The previously ascertained by law clause should be read, I believe, as adding to the geographic clauses of Article III and the Sixth Amendment a prohibition against any ex post facto manipulation of the district of trial by the government, for whatever reason.[5] Such an absolute prohibition against after the fact manipulation of the district of trial has the merit of avoiding the necessity for making any showing that the government sought or obtained any advantage by virtue of the change. It is a merit because in many cases the motive for a manipulation of the place of trial will be undiscoverable.

**3.** The Sixth Amendment as James Madison proposed it, and as debated in the House of Representatives, guaranteed a speedy trial, confrontation, compulsory process, and counsel, but made no reference to jury trial. A separate amendment, which Madison conceived outside the Bill of Rights, would have replaced Art. III, § 2, cl. 3 with the jury vicinage language to which the majority opinion refers. *See* 1 Annals of Cong. 435–36 (Gales & Seaton ed. 1834).

**4.** Such information as can be gleaned concerning the motivation for the Sixth Amendment's "previously ascertained by law" clause supports the assertion of an underlying purpose unrelated to jury venue or geography. The House debates added to Madison's proposed speedy trial amendment a requirement that trial be held in the state where the crime was committed. 1 Annals of Cong. 756 (Gales & Seaton ed. 1834). The Senate left intact the House version of the speedy trial amendment, but virtually eliminated the jury venue amendment. In a compromise reached in a confer-

ence committee, the Senate acceded to inclusion of a jury venue clause, and the House agreed to addition of the previously ascertained by law clause. J. Goebel, History of the Supreme Court of the United States: Antecedents and Beginnings to 1801 (vol. 1, Oliver Wendell Holmes Devise History) 449, 455 (1971). The preexistence of a geographical limitation, and the Senate's hostility to a jury venue provision suggest the previously ascertained by law clause concerns more than the provenance of jurors or the location of the crime.

*See also United States v. Wilson*, 28 Fed.Cas. 699, 713 (E.D.Pa.1830) (previously ascertained by law clause relates to court's jurisdiction; no mention of jury venue).

**5.** *Cf. Lewis v. United States*, 279 U.S. 63, 70–71, 49 S.Ct. 257, 259, 73 L.Ed. 615 (1929) (rearrangement of counties among two federal districts does not violate defendant's Sixth Amendment rights because territorial jurisdiction was not changed for the prosecution of past offenses).

If I am right that the previously ascertained by law clause in the Sixth Amendment has an anti-manipulative purpose entirely separate from and additional to the place of trial provisions of Article III and the Sixth Amendment, the case against applying the clause and that purpose to the states is singularly unimpressive. As the majority quite fairly acknowledges, removal of the defendant to a new place of trial not previously ascertained by law without disclosed good reasons, without notice and an opportunity to be heard, has serious due process resonances. Here a technical anti-manipulative provision of the Constitution provides a ready due process standard. No reasons of policy have been offered in the majority opinion or in the brief for the State of New Jersey suggesting why that state or any other should have the power to manipulate the place of trial, without even disclosing reasons for that manipulation. Whatever the reasons for the exercise of that power were, they certainly were perceived by the prosecutor to be beneficial to New Jersey, not to Mr. Zicarelli. The state may have feared a Hudson County jury would have been unfairly predisposed to Mr. Zicarelli; the state's concern has no bearing on the Sixth Amendment inquiry, however. The fundamental point must be made that while the Sixth Amendment protects criminal defendants' rights to a fair trial, the Constitution bestows no fair trial guarantees on the government. The Sixth Amendment is a limitation on the government's prosecutorial powers. Hence criminal defendants may assert fair cross section claims, or require removal of the trial to another county or district. Nothing in the Constitution endows the government with reciprocal benefits. Prior to 1868 the assertion of the power to manipulate the place of trial was only a matter of local concern. But since ratification of the Fourteenth Amendment I see no reason why the national policy reflected in the previously ascertained by law clause should not apply.

I would reverse the judgment of the district court and remand with directions to issue the writ of habeas corpus on the ground that the ex parte after the fact change in the place of trial violated the anti-manipulative policy of the Sixth Amendment.