**Maurice LaROCHE, Petitioner, Appellant,**

v.

**Everett I. PERRIN, Warden, Etc., et al., Respondent, Appellee.**

No. 82–1650.

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1983.

Decided Sept. 30, 1983.

Joseph A. Dickinson, Concord, N.H., by appointment of the Court, for petitioner, appellant.

Paul Barbadno, Concord, N.H., with whom Gregory H. Smith, Atty. Gen., and Donald J. Perrault, Asst. Atty. Gen., Concord, N.H., was on brief, for respondent, appellee.

Before ALDRICH and CAMPBELL, Circuit Judges, and PETTINE,* Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

On this appeal under 28 U.S.C. § 2253 from the summary denial of his petition for a writ of habeas corpus, petitioner attacks the jury selection system in effect in New Hampshire at the time he was tried, complaining as to underrepresentation of blacks with respect to grand juries, and of young persons on petit juries. We sustain him as to the latter.

Petitioner was indicted for first degree assault by a Rockingham County grand jury in June, 1980. He moved before trial to dismiss the indictment and to quash the petit jury venire on the ground that the jury selection system as applied was unconstitutional. In an evidentiary hearing consolidating similar motions made by other defendants criminally charged in unrelated cases, petitioner attempted to show that 18 to 34 year olds, and blacks, were consistently underrepresented. Testifying were the clerk of court, attorneys, selectmen or members of their staff, a statistics professor, a former assistant county attorney, and a public defender office staff member. The state trial court denied the motions to dismiss the indictments and to quash the petit jury venire, and one Elbert, but not petitioner, appealed. On January 30, 1981 the New Hampshire Supreme Court found neither 18 to 34 year olds nor blacks to be unconstitutionally underrepresented. It found the jury selection statute, N.H. RSA c. 500–A (Supp.1979) unconstitutional, however, because it "has the potential for such exclusion . . . ." It also ordered future jury lists to be selected at random from voter registration lists. Perhaps realizing the

---

* Of the District of Rhode Island, sitting by designation.

anomaly thus presented, the court modified its opinion on February 9, 1981, removing that part of the opinion holding the statute unconstitutional. *State v. Elbert,* 1981, 121 N.H. 43, 424 A.2d 1147. The New Hampshire legislature subsequently amended the jury selection statute to provide for random selection of jurors. *See* N.H. RSA c. 500–A (Supp.1981).

In 1980 New Hampshire used somewhat of a "key man" selection system. The selectmen in each Rockingham County town each year submitted names of "such men and women . . . as they judge eligible to serve as jurors." RSA 500–A:2 (Supp. 1979). They were asked to submit about an equal number of men and women, but to omit those "deceased, ill, infirm, no longer residents of your town or otherwise not qualified to serve . . . ." The evidence showed that only one selectman randomly chose names, and that most tended to pick those they knew. Selectmen testifying were both young and old, and almost all stated that they relied on voter registration lists, a recognized appropriate source.[1] At least one, improperly, would always pick persons who had asked to serve, while another did the opposite. All testified that they did not intentionally discriminate on the basis of age or race.

The names received from the selectmen were compiled into a master list from which both grand and petit jurors were picked at random. Each juror selected was sent a questionnaire which contained an entry for age but not race. Most questionnaires were filled out and returned, but some were returned undelivered and some potential jurors simply responded with a request to be excused.

Data drawn from the 1970 U.S. census showed that 18 to 34 year olds and blacks, respectively, constituted 38.4% and just under 1% of Rockingham County's population. Data taken from questionnaires of the petit jurors serving on venires drawn from the master list in the January, 1979 term, and of the petit and grand jurors serving in the April and September, 1980 terms, showed that 18 to 34 year olds constituted 10.8% of the petit jury venires during those terms, and 13.5% of the grand juries. Since data on race was unavailable, testimony was taken from attorneys and one former assistant county attorney who had experience with the petit and grand juries between 1978 and 1980. Only two black petit jurors were remembered to have served during this time, and no black grand jurors were remembered.[2] Petitioner's statistician testified that 18 to 34 year olds and blacks were substantially underrepresented, given their numbers in the population of Rockingham County, and that it was highly unlikely that a random selection system would produce these results.

The matter of blacks can be promptly disposed of. Petitioner has standing to raise this issue, even though he himself is not black, because of his right under the due process clause of the Fourteenth Amendment to a grand jury that is constitutionally composed. *See Peters v. Kiff,* 1972, 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (plurality). However, he has failed to show that blacks were materially underrepresented. Blacks constituted under 1% of Rockingham County's population during the relevant period. The total number of grand jurors serving during those years was 120, and hence at most one or two blacks should have served under a random selection system. A shortfall from 1% to 0% hardly constitutes material underrepresentation. *See, e.g., Bryant v. Wainwright,* 11 Cir., 1982, 686 F.2d 1373, 1378; *United States v. Whitley,* 8 Cir., 1974, 491 F.2d 1248, 1249, *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769. Put another way, even on a strict mathematical basis,

1. Petitioner would make much of the fact that one selectman occasionally took names from the property tax list. This was de minimis, and will not be referred to again.

2. Petitioner erroneously states that only one black served during this time. One lawyer recalled one black serving in 1978; the county attorney and another lawyer recalled one serving in 1979. None was recalled serving in 1980.

only one 23-member grand jury in four would have had a single black. Furthermore, as both grand and petit juries were drawn from the same venires, the number of blacks appearing on petit juries must be looked at to obtain a full overview of the system. Finally, petitioner's expert's· opinion erroneously assumed one, rather than two blacks. This was not a prima facie case.

■ On the matter of 18 to 34 year olds petitioner again, regardless of his age, has a right under the Sixth Amendment to a petit jury drawn from a venire chosen in a manner directed at obtaining a fair cross-section of the community. *Duren v. Missouri,* 1979, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579. There the Court said, at 364, 99 S.Ct. at 668.

> "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this representation is due to systematic exclusion of the group in the jury-selection process."

■ Both parties look to our decision in *United States v. Butera,* 1 Cir., 1970, 420 F.2d 564; petitioner because we there accepted that 21 to 34 year olds constituted a distinctive group, and the state because we there dismissed a substantial disparity because "inadvertent; " finding that everyone has acted in good faith and without conscious discrimination. Unfortunately for the state here, however, this last is no longer law. The issue is not whether the discrepancy was purposeful; *Duren,* at 366, 99 S.Ct. at 669, defined "systematic exclusion" as simply one that was "inherent in the particular jury-selection process; " viz., the system's result, regardless of intent. We are not concerned with perfection, but, assuming a distinctive group, a process which, however neutral on its face, consistently underran by some 70%, producing one juror

when there should have been four, is surely excessive. Indeed, this is almost exactly the shortfall which the *Duren* court held to make out a prima facie case, a circumstance not noted by the New Hampshire Court when it stated that, "assuming *arguendo* that young people are a 'cognizable' class . . . [o]n the basis of these statistics, we do not find that young people are underrepresented to an unconstitutional degree." We must hold that, prima facie, they were.

■ Next, *Duren* held that if the defendant establishes a prima facie violation, the burden shifts to the state to justify the underrepresentation. *Id.,* at 367–68, 99 S.Ct. at 670–671.

Accordingly, again accepting *Butera* as correct with regard to youth as a distinctive group, the question is whether the state met its burden of explanation. This, *Duren* points out, 439 U.S., ante, at 369, 99 S.Ct. at 671, means "demonstrate," and not by "suggestions and assertions." Yet the latter seems precisely the state's case. No specifics were offered. After noting that there were unidentified "excusals and disqualifications," the state argues that these were "not likely to be [proportional] with regard to age." "The statutory excusal and disqualification criteria *may well have* a disproportionate impact upon a given class of persons." (Emphasis suppl.) The state then notes that women with children under twelve may request exemption; that young persons may be away at college or in the military service, and hypothesizes that voting lists may disproportionately omit younger persons. It further cites a pre-*Duren* case taking judicial notice of such possibilities. *United States v. DiTommaso,* 4 Cir., 1968, 405 F.2d 385, 389, *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465, and concludes, "All of these factors may have an impact on the statistical representation of a given group at any given time."

So they may, but to what extent? This is far from a "demonstration" that they were

the cause of so substantial a shortfall as was shown here.[3]

We turn, therefore, to the question of the vitality of *United States v. Butera,* ante, where we recognized youth—there 21 to 34—as a distinctive group. The state points out that a review of cases in other circuits reveals that *Butera* has not been hospitably received. Mainly, however, these cases have involved a narrower age group. Here we are painting broadly, and saying that in taking the community as a whole there are notable differences, without making an exact demarcation, between a group 18 to 34 and one 35 to 70. It is not necessary to say that everyone's thinking and experience falls on one side or the other. In *Peters v. Kiff,* 407 U.S., ante, at 503, 504, 92 S.Ct. at 2168, 2169, the Court said,

> "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

*See, also, Taylor v. Louisiana,* 1975, 419 U.S. 522, 531–32, 95 S.Ct. 692, 698–699, 42 L.Ed.2d 690.

Even the state's brief concedes, "[T]here undoubtedly is a societal concept of the attitudes, beliefs and points of view held by the young ...." We do not accept its answer, that "the concept is vague and incapable of precise definition," spelled out in *United States v. Potter,* 9 Cir., 1977, 552 F.2d 901, at 905, where the court said,

> "As we noted in *Ross [United States v. Ross,* 9 Cir., 1972, 468 F.2d 1213, *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188] 'There appears to be no factor other than age which defines this group [the young], and we can perceive no reason to arbitrarily single out a narrow group of "young persons" as opposed to "middle-aged" or "old" persons for purposes of jury service.' 468 F.2d at 1217. While some may consider 'young people' as a distinct group, and some may even look upon them with disfavor (rather than favor, or neutrality), there is clearly no community agreement regarding the age range to be included in the category 'young people.' We conclude that there is no cognizable 'magic' about a group whose sole identifiable characteristic is that each member is in the age range of 18–34."

This is damned if you do, and damned if you don't. If the age group selected is small, it is too narrow; if it is broader, it is too comprehensive. Yet even the *Potter* court concedes that "young people" may be considered by "some" as a "distinctive group." We think "some" an understatement, and that the issue is not to be avoided by a syllogistic ploy of fragmentation. This would be to write off the entire matter.

A system averaging 1.5—instead of 4.5—jurors under 35 for every 12 on the master list could, in practice, easily result in a panel with none at all. A young person realizing that the absence of his peers was due to other than chance would surely think the cards stacked. So may any defendant entitled to a fair shot at a cross-section of the community. Even though we may not hear today such rallying cries as "Never

---

**3.** This opinion in no way suggests that nonautomatic or even automatic exemptions from jury service leading to a shortfall, or even total elimination, of a distinctive group could not in some cases be justified by legitimate state interests. *See Brown v. Harris,* 2 Cir., 1981, 666 F.2d 782, 784, *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472; *United States v. Benmuhar,* 1 Cir., 1981, 658 F.2d 14, 19–20, *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328; *United States v. Foxworth,* 1 Cir., 1979, 599 F.2d 1, 4. *Duren* clearly permits the state to show that any failure was "manifestly and primarily advanced" by a "significant state interest." 439 U.S. ante, at 367, 99 S.Ct. at 670, and we assume the state interest in the factors here asserted. However, *Duren* equally states the causal connection must be demonstrated. *See, e.g., Brown v. Harris,* ante. We merely hold that the state entirely failed to show that it was these factors, rather than the selectmen's personal judgment, that consistently eliminated nearly three out of every four "young" prospects.

trust anyone over thirty," or, to go back to our own youth, that our elders were "old dodos," we do not feel it necessary to have testimony of psychologists to believe that young persons may have different "varieties of human experience" and "perspective[s] on human events." Nor can we think youth as an "[un]identifiable segment of the community." While the lines between age groups are not as sharp as between men and women, or between whites and blacks, we hold that such a substantial shortfall of youth as was produced by the former New Hampshire system was unconstitutionally unrepresentative of the community.

The judgment of the district court is reversed, and an entry is to be made ordering the writ granted unless petitioner is retried in the state superior court within 90 days of mandate herein.

LEVIN H. CAMPBELL, Chief Judge (dissenting).

I do not agree that we should grant a writ of habeas corpus to petitioner.

In approaching this matter, I think it necessary to bear in mind that, even on my colleagues' premise, petitioner was not tried before a jury that was per se unconstitutional. While the average age of all those called for jury duty in the county might have been somewhat older than in the general population, that fact alone would not, as my colleagues concede, render the jury unfit or incompetent in any absolute sense. Had the age disparity resulted from proper exemptions (such as exemption of mothers of young children), or objective circumstances (such as that young people did not register to vote in as large numbers as older people), petitioner would clearly have had no complaint notwithstanding any statistical imbalance.

To be sure, the mere fact a trial before this exact same jury (selected against a background of the same disproportionality) *could* be constitutional does not necessarily make it so if the failure to provide a more accurate cross-section was due to the state's misconduct. Here the court found that the State of New Hampshire did not carry its burden of proving that underrepresentation of people between 18 and 34 was due to lawful exemptions or to objective circumstances beyond the state's control.

I question, however, whether misconduct by the State of New Hampshire was shown sufficient to justify granting the writ of habeas corpus in these circumstances. Given that petitioner's jury was basically fit and competent, the authorities should not be put to the burden of a new trial unless a new trial is required to punish the state or to force it to take more effective future measures to obtain a genuine cross-section. No such necessity exists in this case.

First, the State of New Hampshire has demonstrated its good faith by legislatively changing the challenged system from a "key man" system to a random one. There is no need to retry petitioner in order to send a message to the state. That message was transmitted by the Supreme Court of New Hampshire some time ago and was received and acted upon by the state legislature.

Second, the key man system which my colleagues now find productive of unconstitutional results is the same system that this very circuit sustained in *United States v. Butera*, 420 F.2d 564 (1st Cir.1970). Unless we mean to suggest that this court acted irresponsibly in 1970, New Hampshire cannot be charged with bad faith in maintaining the system under which petitioner was tried. The most, it seems to me, that can be said now is that "evolving standards" since *Butera* have caught up with New Hampshire, compelling alteration of what had previously been thought to be (in the very best circles) a perfectly constitutional system. If that is what happened, it is an empty gesture to force New Hampshire to retry petitioner. He was fairly tried before a jury whose only possible fault lay in a slightly enhanced risk that more of its members were somewhat older than ideally they might have been. And this was done in good faith and without deliberate discrimination. It does not seem to me that the defect involves a sufficient chance of

unreliability—or any unreliability—as to warrant a new trial. Were New Hampshire refusing to change with the times, perhaps a new trial would be required to signal that the court means business.[1] Clearly a new trial is not needed for that purpose here.

My colleagues' basic position appears to be that they are "compelled," even perhaps against their own better judgment, to hold petitioner's trial unconstitutional because of the Supreme Court's decision in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). I do not agree.

*Duren* was a case involving a state law which specifically provided that women could opt out of jury service. It was one of a number of cases which, in the last decade, have disfavored laws making overt distinctions grounded on gender. Not only does the present case not involve underrepresentation of a "suspect class" such as blacks or women, which have historically been the targets of discrimination, it does not involve a dubious state law which placed the people shown to be statistically underrepresented in a special category for jury-service purposes. No New Hampshire statute expressly places "young people" (however defined) in a special position with respect to jury service. New Hampshire's key-man system is facially neutral. And indeed it is conjectural whether that system caused the statistical imbalance complained of, or whether other, constitutionally acceptable, factors did. There is scant evidence that any town officials consciously or actually shied away from 18- to 34-year olds in picking jurors.[2] That in New Hampshire women with children under 12 may request exemption is an alternative factor which could have contributed to a smaller pool of younger voters. And the fact that many people between 18 and 34 may be away—either in the military or at educational institutions—is another plausible reason that could have contributed to disproportionality. *See United States v. Foxworth,* 599 F.2d 1 (1st Cir.1979); *United States v. Test,* 550 F.2d 577, 584, 587 n. 10 (10th Cir.1976). It is recognized that younger people are less likely to register to vote. *See, e.g., United States v. Leonetti,* 291 F.Supp. 461, 476–77 (S.D.N.Y.1968). Yet voting lists are universally accepted for juror qualification. *See, e.g., United States v. Kleifgen,* 557 F.2d 1293, 1295–96 (9th Cir.1977). And even the statistics in the present case were dependent on voluntary responses to questionnaires. Young people may well be poorer respondents than their elders. *See United States v. DiTommaso,* 405 F.2d 385, 389 (4th Cir.1968).

Factors such as the above led this court in *Butera* to hold that, while 21–34 year olds were a "distinctive group," the government had adequately explained away their statistical underrepresentation (which in *Butera* was as great as it is here). The court today carries forward *Butera's* holding that young people are a "distinctive" group—a holding that other courts have since rejected—while refusing to follow *Butera's* holding that the government met its burden of explanation. My colleagues insist that *Duren,* decided after *Butera,* requires this result. But as already pointed out, *Duren* is factually very different, involving a state law providing a blanket gender-based exemption from jury service. Given the latter, it is small wonder the *Duren* court adopted a tough show-me attitude towards *other* explanations put forward to explain away the statistical disparity between men and women.

Here, absent anything similar to the express gender-based exemption in *Duren,* the neutral explanations offered for why the statistical disparity exists are far more plausible and deserve more weight than my colleagues give. I would thus hold that even assuming, arguendo, that people between 18 and 34 are a distinctive group, the

---

1. I realize that in law we like to deal in absolutes—absolute right or absolute wrong, constitutional or unconstitutional conduct, etc. My relativism is not without some precedent, however. *See, e.g., Hoitt v. Vitek,* 497 F.2d 598, 602 (1st Cir.1974).

2. While a few selectmen testified to views or actions which might imply inadvertent age bias, others testified to the contrary. The New Hampshire court, after an evidentiary hearing, found no systematic exclusion. In a habeas proceeding such as this, the state court's finding is entitled to substantial weight, 28 U.S.C. § 2254(b), a point my colleagues do not mention at all.

petitioner never established—as *Duren* required to make out a prima facie case—that the statistical disparity "is due to systematic exclusion of the group in the jury selection process." 439 U.S. at 364. Too many other plausible reasons exist for an appellate court to make this leap as a matter of law.

Finally, I question that persons age 18–34 are a "distinctive group" for purposes of a prima facie case under *Duren*.[3] "Distinctive group" has been used by the Court to identify discrete classes possessing immutable characteristics like blacks or women whose presence or absence from the jury pool is a matter of particular constitutional significance. The sensitive nature of such groups justifies placing a heavy burden of explanation upon the state when their members are absent in substantial numbers from the jury venire. Neither in *Duren* nor elsewhere did the Court indicate that it meant to place a similar burden of justification whenever a statistical showing of imbalance was made with respect to some other more-or-less group. Young people, in particular, is an amorphous concept—does it include people below 45, below 35, or what? And to what degree does age constitute a valid distinction among jurors? One can similarly—and perhaps more convincingly— synthesize groups around the level of education, geography, job-skills, or the like. And if this were done, and if statistical anomalies in the proportion of persons called for jury service relative to total population were found, should those trials also be upset?

In the case of non-suspect classes, I do not believe that unconstitutionality should be inferred as eagerly as do my colleagues simply from a statistical showing of under-representation. When dealing with such groups, I would require evidence of deliberate exclusion, or at least of the existence of clear-cut barriers, with the burden of proof on the petitioner, not the state.

To be sure, we thought young people were "distinctive" in *Butera,* but when we did so we did not have in mind the draconian burden of justification my colleagues now extract from *Duren* and propose to apply so broadly. If *Duren* is to be read as strictly as do my colleagues, it should, I think, be limited to "suspect" categories such as women, minorities or the like which are the only groups the Supreme Court has so far dealt with in these terms. Otherwise, there will be no end of the sociological groups whose absence in strict proportions from the venire will lead to fortuitous new trials.

Thus, I cannot see any proper basis for issuing a writ of habeas corpus in this case. My colleagues' opinion raises far more questions than it settles. Not only does it overturn our decision in *Butera* insofar as *Butera* upholds "key man" selection, it unsettles the already cloudy law in this area by suggesting that there is virtually no limit to the "distinctive groups" which, it can now be insisted by any criminal defendant, must be statistically represented among all the persons from whom jurors are selected if his conviction is to hold. I dissent both from the result and the analysis.

---

**3.** The great weight of authority since our decision in *Butera* supports the proposition that an age grouping such as this one (18–34) is not a distinctive group. *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977); *United States v. Test,* 550 F.2d 577, 590–93 (10th Cir.1976). *See Brown v. Harris,* 666 F.2d 782, 783–84 (2d Cir. 1981) (citing cases).